IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Trianco, LLC, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No. 06-3533 |
| v. | : | |
| | : | |
| International Business | : | |
| Machines Corp., | : | |
| Defendant. | : | |

**OPINION**

**December 21, 2006** **Brody, J.**

The parties in this case dispute whether defendant IBM has a binding obligation to issue a subcontract at a price plaintiff Trianco proposed. Because IBM and Trianco's "Teaming Agreement" left price negotiations for the subcontract price to a future date, under New York law IBM is not bound to issue Trianco the subcontract.[1] At most, Trianco and IBM could be ordered back to the bargaining table to negotiate a subcontract price tabula rasa in good faith, but Trianco's complaint forecloses this relief because it manifestly refuses to negotiate tabula rasa. Accordingly, the breach of contract claim is dismissed for failure to state a claim. Trianco's claims for breach of fiduciary duty,

---

[1] As per the terms of the parties' written agreement, New York law governs the the contract claims. This opinion applies both New York and Pennsylvania law to the non-contract law claims for which there is any question of the governing state law.

O:\ABB 2006\Trianco motion to dismiss opinion.wpd

implied covenant of good faith and fair dealing, unjust enrichment, equitable estoppel, and promissory estoppel are also dismissed.

BACKGROUND

Plaintiff Trianco is a limited liability construction company domiciled in Pennsylvania with decades of subcontracting experience installing computerized checkstands at Department of Defense commissaries worldwide. In 2005, the government solicited bid proposals to install new computerized checkstands at 280 military commissaries in the U.S. and abroad. Defendant IBM determined to bid for this contract. Deciding to join forces with IBM in May 2005, plaintiff Trianco entered into a Teaming Agreement with IBM. Under the terms of the Teaming Agreement, Trianco was to provide IBM exclusive technical information it possessed by virtue of its decades of experience in the field, including Trianco's pricing proposal for its own work on the potential contract. IBM would use this information to prepare the prime bid. Trianco agreed not to collaborate with any company other than IBM during the bid preparation phase. As agreed, Trianco provided the information needed to prepare the bid and around August 15, 2005 submitted its pricing information to IBM. IBM submitted its bid to the government around the same day. The prime bid used the technical information Trianco had provided and listed Trianco's name as a subcontractor.

In accordance with government procedure, IBM submitted its "Best and Final Offer" (BAFO) on November 21, 2005 and was awarded the prime contract worth almost $300,000,000 around December 31, 2005. Around January 27, 2006, IBM asked Trianco to quote new prices to compete with other subcontractors for the job. On around March

6, 2006, Trianco submitted a new bid "under protest," which IBM rejected for another subcontractor's much lower bid. Thereafter, Trianco brought this suit for breach of contract asking for specific performance consisting of the award of a subcontract at the price Trianco offered in the pre-bid phase under the Teaming Agreement. In the alternative, Trianco asks for money damages. Trianco also brings claims for breach of fiduciary duty, implied covenant of good faith and fair dealing, unjust enrichment, equitable estoppel, and promissory estoppel. IBM filed the present Motion to Dismiss.

THE TEAMING AGREEMENT

Under the Teaming Agreement, Trianco was to assist IBM with preparing its prime bid. Trianco's primary responsibility was to provide information "necessary for [IBM's bid to the government] to be responsive" and provide other assistance in preparing the prime bid. The Teaming Agreement also contained an outline of the "Scope of Work" Trianco would perform under a potential subcontract.

The Teaming Agreement mentions Trianco's potential subcontract price in several instances: Trianco was to provide information about "cost and pricing"and was responsible for "prepar[ing] a cost/price or technical proposal for the specific areas of responsibility" that Trianco would perform in a potential subcontract. The Teaming Agreement did not include a specific price term for Trianco's potential subcontract, but it did provide a method to determine a price ceiling: Trianco would "supply the equipment and/or services...at prices that do not exceed" the prices Trianco provided to IBM in compliance with the Teaming Agreement. Finally, IBM would have "sole discretion" in setting the overall price of the entire prime bid to the Government.

In several instances, the Teaming Agreement asserts that Trianco "will" or "shall" be awarded a subcontract if IBM won the prime bid. In particular, IBM agreed that "Upon award to IBM of a prime contract, IBM will award a subcontract to [Trianco]" and that "subject to successful contract award...IBM shall offer Trianco a Subcontract." But the Teaming Agreement also specifies that "after the successful award of a contract to IBM, the parties will in good faith negotiate mutually acceptable terms and conditions of the subcontract." Further, the Teaming Agreement terminates if "[t]he parties fail to negotiate and execute a subcontract agreement containing mutually satisfactory prices and terms within a reasonable period after the award of the prime contract to IBM." Lastly, Trianco was required to offer "competitive pricing, availability of competent resources, and an acceptable plan/strategy" in order to obtain "the right of first refusal" to perform a subcontract.

MOTION TO DISMISS STANDARD

Under rule 12(b)(6), a court must grant a motion to dismiss is "it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The court regards all well pleaded factual allegations as true and draws all reasonable inferences from such allegations in favor of the complainant. *Weston v. Pennsylvania*, 251 F.3d 420, 425 (3d Cir.2001). "[D]ismissal is justified only when the allegations of the complaint itself clearly demonstrate that whatever interpretation is given to the facts the plaintiff does not have a claim that is legally redressible." 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004). Dismissal is appropriate where the

terms of a contract included in the complaint contradict the allegations in the complaint. *Id.* at n.60.

DISCUSSION

I. Contract Claims

Trianco argues that the Teaming Agreement constitutes a binding contract obligating IBM to issue Trianco a subcontract "based on" the price proposal Trianco provided under the Teaming Agreement – that is, the price Trianco offered *before* IBM was awarded the prime contract by the government. Trianco asks for specific performance or money damages as a remedy. IBM does not dispute that the Teaming Agreement is binding as far as the prime bid preparation phase goes, but says that the Teaming Agreement's expressions of intent to award Trianco the subcontract after the government awarded it the prime contract are nonbinding because a price was never negotiated. According to IBM, it never accepted the pre-prime bid prices Trianco submitted under the Teaming Agreement, and the Teaming Agreement contemplates that the parties would enter into price negotiations *after* the prime contract award.

In essence, Trianco sees one binding contract that stretches from bid preparation through execution of the prime contract with Trianco as a subcontractor, with a condition precedent that IBM be awarded the prime contract in order for Trianco to be awarded the subcontract. IBM sees a binding contract of shorter duration covering only the bid preparation, followed by a non-binding "agreement to agree" on a subcontract. To IBM, this "agreement to agree" gives rise to no contractual obligation to accept Trianco's pre-

prime bid price proposal for a subcontract. At most, it obligates the parties to negotiate in good faith for a subcontract price.

Contractual terms will be given their plain meaning where the intention of the parties is clear and unambiguous. *South Road Associates, LLC v. Intern. Business Machines Corp.,* 4 N.Y.3d 272, 278 (N.Y. 2005). Whether a contract is ambiguous is a question of law and extrinsic evidence may not be considered unless the document itself is ambiguous. *Id.* Every material term must be agreed upon in order to form a binding contract, and the court will not enforce a contract if price negotiations are left to a future date. *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109-10 (N.Y. 1981) ("[I]t is rightfully well settled in the common law of contracts...that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable."). *See also Brown v. Cara*, 420 F.3d 148 (2d Cir. 2005); *Clifford R. Gray, Inc. v. LeChase Constr. Servs*, 819 N.Y.S.2d 182 (N.Y. App. Div. 2006).

In *Gray*, much like in this case, a plaintiff subcontractor had promised exclusive assistance to a contractor during the primary bid preparation phase. 819 N.Y.S.2d at 184. The contractor, in turn, promised the subcontractor that it would be the "exclusive subcontractor" if the contractor were awarded the prime contract. But when the prime contract was awarded, the contractor opened up competitive bidding to subcontractors and did not award the subcontract to the plaintiff. The plaintiff sued for a subcontract, but the court dismissed the contract law claims because the parties had not agreed on a price for the subcontract in their bid preparation deal. *Id.* at 185-86.

On the other hand, an enforceable contract need not spell an exact dollar amount. *Cobble Hill Nursing Home, Inc. v. Henry and Warren*, 74 N.Y.2d 475 (N.Y. 1989). As long as the contract provides a method of ascertaining the price, it will be enforceable:

> Where at the time of agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage. A price so arrived at would have been the end product of agreement between the parties themselves.

*Id.* at 483 (internal citations omitted).

The case *Barry v. Liddle*, 98 F.3d 36 (2d Cir. 1996), provides a good example of applying *Cobble Hill* to look for a valid external method to determine price. In *Barry,* an employment contract stated that the employee's total compensation would include a "[m]inimum of 50% of pre tax revenues" of a particular unit of the business. *Id.* at 40. Because the revenues of that unit would have been externally ascertainable, the court ruled that the contract would have been enforceable. *Id.* at 37.

In *Henri Associates v. Saxony Carpet Company, Inc.*, 671 N.Y.S.2d 46 (N.Y. App. Div. 1998), the court found an enforceable price term despite the fact that the exact price was not fixed in the contract. A homeowner and a flooring contractor entered into an agreement stating that the prices for the flooring job "will approximate schedle [sic] attached." *Id.* at 48. The attached schedule listed a price of $93,030, but said that the figure was an "[e]stimate [s]ubject to final [s]election and confirmation of area." *Id.* After the agreement was signed, the flooring contractor increased its price to $123,372.

The court found that the higher price was enforceable because the agreement contemplated that the price might increase subject to the final dimensions of the flooring job. *Id.* In other words, the parties had agreed to material terms that allowed the calculation of a final price without further negotiation. The homeowner's ultimate specifications of the area to be floored could be objectively plugged into the original agreement to result in the final price. As long as that price was a valid approximation of the $93,030 listed in the schedule, the price term was definite and the contract enforceable.

In this case, Trianco and IBM did not include a definite or approximate subcontract price in the Teaming Agreement, nor does the Teaming Agreement contain an objective method to ascertain a price. On the contrary, looking only to the four corners of the Teaming Agreement, it is clear that the parties' objective intent was to leave negotiation of a subcontract price until *after* IBM received the prime contract from the government. The agreement does include much seemingly mandatory language about the subcontract – for example, that "IBM will award a subcontract" to Trianco. However, as the *Gray* case demonstrates, such language does not alone constitute a binding contract in the absence of fully agreed-upon price. Further, taking the Teaming Agreement as a whole, it is clear that this mandatory language is modified by the provisions that award of a subcontract was contingent on further negotiations.

The only rational reading of the Teaming Agreement's unambiguous language is that award of the subcontract is contingent on future negotiations. The Teaming Agreement clearly spells out that "After the successful award of a contract to IBM, the parties will in good faith negotiate mutually acceptable terms of the subcontract." The

agreement would terminate unless the parties "negotiate and execute a subcontract agreement containing mutually satisfactory prices and terms within a reasonable period after the award of the prime contract." These negotiations were contemplated to be competitive: "If Trianco offers competitive pricing...Trianco will have the right of first refusal to perform the work." There was no promise that Trianco would be the only bidder, nor that IBM would inform Trianco that it had not accepted its original price proposal at any point earlier in the game than after the award of the prime bid.[2]

Trianco argues that the Teaming Agreement's requirement that it submit price proposals to IBM during the prime bid preparation phase constitutes an objective mechanism for determining a definite price under New York law. But the language of the Teaming Agreement does not permit Trianco's interpretation. Unlike in *Henri* and *Barry*, the two New York cases where the courts found an external mechanism in the contract, the Teaming Agreement contains no language at all suggesting that Trianco's proposed pricing would form the definite basis---even an approximate basis---of an eventual subcontract. Instead, the Teaming Agreement's manifest intent is to leave negotiations of subcontract price to a future date. Thus, the prices Trianco provided as required by the Teaming Agreement during the prime bid preparation phase do not create a definite price term. At the most, they create a price ceiling, since Trianco was required to provide the services "at prices that do not exceed the prices set forth" in its prime-bid preparation submission to IBM. But such a ceiling is far from providing the definiteness required by New York law: In *Henri*, the parties had at least agreed that the listed price

---

[2] In fact, Trianco admitted in its original Complaint that it knew that other subcontractors would be bidding for the job. Cmplt. ¶ 15.

would approximate the final price. A price ceiling does not serve the same function of providing definiteness.

Nor can Trianco show evidence that there is any possible meaning of the word "competitive" in the Teaming Agreement that could provide an objective means of ascertaining the subcontract price, as did the reference to ex post revenues in *Barry*. Trianco suggests that the meaning of "competitive" is ambiguous and that it could present evidence showing that the word as used in the Teaming Agreement refers to custom and usage in federal procurement contracting. According to Trianco, this extrinsic standard would show that Trianco's price was "competitive" within the meaning of the agreement and so had to be accepted by IBM. But Trianco also repeatedly insists in the complaint that it could never meet the "rockbottom" prices of the competitor who ultimately won the subcontract, and argues that it never knew that "competitive" meant "lowest available price" or "prices lower than or equal to those of a competitor." 2d Amend. Cmplt. ¶ 12, 36, 37; Pltff. Br. at 23, 27. Further, Trianco requests the injunctive relief of a subcontract at prices "not materially lower than those previously proposed by Trianco." 2d Amend. Cmplt. ¶ 41, 45. Given Trianco's steadfast representations throughout this case that it could never come close to meeting its competitor's price, which Trianco admits were significantly lower than its own proposed prices, there is no possible interpretation of the word "competitive" that could apply to Trianco's price. It may be that "competitive" does not mean "absolute lowest price offered," but it would strain credulity to view Trianco's significantly higher price as "competitive" under any reasonable definition of the word. Thus, no possible interpretation of the Teaming Agreement supports an enforceable subcontract between Trianco and IBM at the price

Trianco proposed under the Teaming Agreement. After it won the prime bid, IBM had the right to proceed exactly as it did: requiring subcontract negotiations and rejecting Trianco's price as noncompetitive when negotiations failed.

One possibility for a modicum of enforceablility of the subcontract agreement remains.[3] Although New York will not enforce a contract where, as here, the price term is not settled or otherwise ascertainable from the contract, the court might find that the parties are bound to negotiate the open terms in good faith and order them back to the bargaining table. *See, e.g., Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998). In this case, the parties were bound to negotiate in good faith. But Trianco does not request tabula rasa negotiations; instead, it demands negotiations "based on Trianco's proposed pricing." Cmplt. ¶ 45. The entire thrust of Trianco's case is that it is *not* required to negotiate in an open market. As such, Trianco's complaint cannot support a claim for a breach of an agreement to negotiate in good faith. Accordingly, the breach of contract claim is dismissed.

II. Breach of Fiduciary Duty

Trianco alleges that a fiduciary relationship was created by the Teaming Agreement and IBM's "representations and assurances" that Trianco would get the subcontract. Under New York law, fiduciary duty

> exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope

[3] The question of whether the bid-preparation phase obligations of the Teaming Agreement are all enforceable – for example, Trianco's exclusivity agreement – is not reached by this case. In theory, IBM may have provided some consideration (other than a guaranteed subcontract) to Trianco in return for its exclusive collaboration during the bid preparation.

> of the relation. Such a relationship, necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions. Generally, where parties have entered into a contract, courts look to that agreement to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency. If the parties . . . do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them. However, it is fundamental that fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation.
>
> *EBC I, Inc. v. Goldman Sachs & Co.,* 5 N.Y.3d 11, 19-20 (N.Y. 2005) (internal citations ommitted).

At the motion to dismiss stage, this fact-based inquiry into the existence of the fiduciary duty must focus on whether any set of facts could support the allegations in the complaint. The first item to consider is the Teaming Agreement: IBM and Trianco's relationship was created by the Teaming Agreement, which was negotiated at arms length by two presumably saavy businesses. Although IBM is orders of magnitude larger than Trianco, Trianco is no neophyte: it had decades of prior experience in government subcontracting. Without more, a transaction between two such parties does not give rise to a fiduciary relationship under New York law, even if one party has superior bargaining power. *Sony Music Entm't Inc. v. Robison*, 2002 WL 272406 *3 (S.D.N.Y. Feb. 26, 2002).

At any rate, Trianco was never even in a position of greatly asymmetrical bargaining power. As the complaint alleges, Trianco's collaboration on IBM's prime bid proposal was uniquely valuable because of Trianco's depth of knowledge about military commissary projects, and because the exclusive arrangement precluded IBM's

main competitors from benefitting from Trianco's knowledge. Trianco did throw its lot in with IBM at the risk of losing its investment if IBM did not award it the subcontract, but nothing in the complaint provides a basis to argue that this configuration of interests reflects anything other than independent, calculated business decisions by both parties. Trianco had no basis to reasonably believe that IBM was loyal to Trianco's best interests or that their interests were completely aligned: the Teaming Agreement made clear that Trianco would have to face competition for the subcontract. *See EBC I,* 5 N.Y.3d at 20-21 (fiduciary duty claim survives motion to dismiss where plaintiff alleged that it reasonably believed defendant was acting in a confidential, advisory capacity).

Trianco claims that in addition to the Teaming Agreement, IBM's "representations and assurances" created the special relationship of trust, a close reading of the complaint shows that the alleged representations and assurances consist of no more than IBM's exercise of its specific rights under the Teaming Agreement – e.g., IBM's use of Trianco's name in the prime bid to the government; IBM's waiting until after the prime bid award to begin subcontract price negotiations; IBM's requiring Trianco to bid competitively for the subcontract. Trianco has not made any allegations in its complaint that can be factually supported to show that IBM and Trianco's conduct created special relationship of trust. This claim is accordingly dismissed.

III. Breach of Implied Covenant of Good Faith and Fair Dealing

Trianco's breach of implied covenant of good faith and fair dealing claim is based on and incorporates the same allegations that the breach of contract claim is based on: that IBM stopped Trianco from getting the subcontract. New York does not recognize a

separate cause of action for implied covenant of good faith if a breach of contract claim is pled on the same facts. *Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir.2002). The claim is dismissed.

IV. Unjust Enrichment

The Teaming Agreement was an enforceable contract to the extent that it bound the parties to negotiate for a subcontract price in good faith after the award of the prime bid. The existence of a valid contract precludes a claim for unjust enrichment under New York or Pennsylvania law. *Clark-Fitzpatrick, Inc. v. Lond Island Rail Road Co.,* 70 N.Y.2d 382, 388 (1987); *Wilson Area School Dist. v. Skepton*, 895 A.2d 1250, 1254-55 (Pa. 2006). Consequently, this claim is also be dismissed.

V. Equitable Estoppel

Under either Pennsylvania or New York law, the equitable estoppel claim is dismissed. In Pennsylvania, equitable estoppel is a defense rather than an independent claim. *Carlson v. Arnot-Ogden Memorial Hosp.,* 918 F.2d 411, 416 (3d Cir.1990); *Gilius v. Bd. of Sup'rs of Fairview Tp.,* 122 Pa.Cmwlth. 371, 552 A.2d 327, 330 (1988). It follows that this claim must also be dismissed under Pennsylvania law.

The New York doctrine of equitable estoppel requires "justifiable reliance on the opposing parties' words or conduct." *Nassau Trust Co. v. Montrose Concrete Prods. Corp.,* 451 N.Y.S.2d 663-667-68 (N.Y. 1982). But Trianco has not made a supportable claim that IBM agreed on a price or promised to agree on a price, much less that Trianco reasonably relied on such assurances in light of the clear language of the Teaming

Agreement and the fact that Trianco admittedly knew it was in a competitive bidding situation.

VI. Promissory Estoppel

Trianco claims that the language and performance of the Teaming Agreement constituted an express promise that IBM would award Trianco a subcontract at the prices Trianco had proposed in the pre-bid phase. Promissory estoppel in New York and Pennsylvania require reasonable reliance on an express promise. *Ripple's of Clearview, Inc. v. Le Havre Assocs.,* 452 N.Y.S.2d 447, 449 (Sup. Ct. App. Div. 1982); *Murphy v.* Burke, 545 Pa. 391, 398 (1973). But none of the allegations in Trianco's claim for promissory estoppel constitute such an express promise, for the same reasons that they do not constitute a valid contract or provide a breach of fiduciary duty claim: the allegations in the complaint cannot support the claim that IBM promised Trianco a subcontract at a certain price, explicitly or implicitly. This claim is dismissed.

CONCLUSION

IBM's Motion to Dismiss is granted in its entirety.

Anita B. Brody

ANITA B. BRODY, J.

Copies VIA ECF on to: Copies MAILED on to: