**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TRIANCO, LLC, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | 06-cv-3533 |
| v. | : | |
| | : | |
| INTERNATIONAL BUSINESS | : | |
| MACHINES CORPORATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM AND ORDER**

October 15, 2008

**I.  BACKGROUND**

Plaintiff Trianco, LLC, ("Trianco") is a limited liability construction company domiciled in Pennsylvania with decades of subcontracting experience installing computerized checkstands at Department of Defense commissaries worldwide.  In 2005, the government solicited bid proposals to install new computerized checkstands at 280 military commissaries in the U.S. and abroad.  Defendant International Business Machines Corp. ("IBM") chose to bid for this contract.  In May 2005, Trianco and IBM joined forces and entered into a Teaming Agreement ("Teaming Agreement").   Under the terms of the Teaming Agreement, Trianco agreed to give IBM exclusive technical information that Trianco possessed by virtue of its decades of experience in the field of installing point-of-sale cash registers and checkstand equipment, including Trianco's pricing proposal for its own work as a potential subcontractor.  IBM would use this information

1

to prepare the prime bid.  Trianco agreed not to collaborate with any company other than IBM during the bid preparation phase.

The Teaming Agreement specified that Trianco was responsible for providing assistance in preparing IBM's prime bid, including providing information "necessary for [IBM's bid to the government] to be responsive."  (Teaming Agreement § 1.2).  Under the Teaming Agreement, Trianco would provide information about "cost and pricing" and was responsible for "prepar[ing] a cost/price or technical proposal for the specific areas of responsibility" that Trianco would perform in a potential subcontract.  (Teaming Agreement § 1.2).  Although the Teaming Agreement included no specific price term for Trianco's potential subcontract,  it provided a method to determine a price ceiling.  Specifically, the agreement stated that Trianco would "supply the equipment and/or services ... at prices that do not exceed" the prices that Trianco provided to IBM under the Teaming Agreement.  Id.  Finally, IBM would have "sole discretion" in setting the overall price of the entire prime bid to the Government.  Id. § 1.1.

 The Teaming Agreement also included a document outlining the "Scope of Work" that Trianco would perform under a potential subcontract if IBM was awarded the contract with the government.  The Scope of Work document required Trianco to offer "competitive pricing, availability of competent resources, and an acceptable plan/strategy" in order to obtain "the right of first refusal" to perform a subcontract.  (Scope of Work, 2).

The Teaming Agreement further specified that "after the successful award of a contract to IBM, the parties will in good faith negotiate mutually acceptable terms and conditions of the subcontract."  Id. § 1.3.  Further, the Teaming Agreement terminated if "[t]he parties fail to negotiate and execute a subcontract agreement containing mutually satisfactory prices and terms

2

within a reasonable period after the award of the prime contract to IBM."  In several instances, the Teaming Agreement asserts that Trianco "will" or "shall" be awarded a subcontract if IBM won the prime bid.  In particular, IBM agreed that  "[u]pon award to IBM of a prime contract, IBM will award a subcontract to [Trianco]" and that "subject to successful contract award ... IBM shall offer Trianco a Subcontract."  Id. § 1.2.

As agreed, Trianco provided the information needed to prepare the bid and on or about August 15, 2005, submitted its pricing information to IBM.  In accordance with government procedure, IBM submitted its "Best and Final Offer" (BAFO) on November 21, 2005, using the technical information that Trianco had provided and identifying Trianco's name as a subcontractor. On or about December 31, 2005, IBM was awarded the prime contract worth almost $300,000,000. On or about January 27, 2006, IBM asked Trianco to quote new prices to compete with other subcontractors for the job of site survey, preparation, and installation of the POS systems.  On or about March 6, 2006, Trianco submitted a new bid "under protest," which IBM rejected for another subcontractor's much lower bid.  Trianco conveyed to IBM their displeasure in submitting a new bid that was lower than the bid originally submitted in accordance with the Teaming Agreement.

On August 9, 2006, Trianco brought a suit against IBM for breach of contract asking for specific performance and injunctive relief, or, in the alternative, damages.  Trianco's complaint requested that the court compel IBM to negotiate terms and conditions of a subcontract with Trianco and award a subcontract based on the price Trianco offered in the pre-bid phase under the Teaming Agreement.  Trianco also asserted claims for breach of fiduciary duty, breach of implied covenant of good faith and fair dealing, unjust enrichment, equitable estoppel,  promissory estoppel, and punitive damages.  On September 29, 2006, IBM filed a motion to dismiss on all

3

claims.  On December 21, 2006, I granted this motion to dismiss for all claims and dismissed the complaint.  Trianco, LLC v. Int'l Bus. Mach. Corp., 466 F.Supp.2d 600 (E.D.Pa. 2006) ("Trianco DC").

On appeal, the Third Circuit affirmed my dismissal of Trianco's claims alleging breach of contract, breach of fiduciary duty, breach of implied covenant of good faith and fair dealing, equitable estoppel, and promissory estoppel.  The Circuit Court also affirmed my finding that the Teaming Agreement was an unenforceable "agreement to agree" as to any potential future subcontract[1] under the contract the government awarded to IBM.  This means that IBM was not bound to award the subcontract to Trianco.  The Circuit Court, however, did not reach the issue of whether or not the Teaming Agreement was a binding preliminary agreement to negotiate in good faith under New York law.  The Third Circuit remanded for further clarification regarding Trianco's consideration under the agreement and Trianco's claim for unjust enrichment.

In Trianco DC I held that, though IBM was not bound to award the subcontract to Trianco, the Teaming Agreement was binding on the parties to negotiate in good faith for a subcontract once the primary bid was awarded to IBM.  In their initial filings, neither IBM nor Trianco disputed that the bid preparation aspect of the Teaming Agreement was binding.  Trianco DC, 466 F.Supp.2d at 600.  Also, Trianco could have, but did not, bring a breach of contract claim alleging that IBM failed to negotiate in good faith under the terms of the binding preliminary agreement.  Id. at 607.  On October 10, 2008, at oral arguments to address the remanded issues, Trianco's

---

[1]  When I refer to the "subcontract," I mean a contract establishing Trianco as a subcontractor under the contract between IBM and the government.

counsel reaffirmed that Trianco withdrew any claim that IBM did not negotiate in good faith.[2]

The Third Circuit asked that I more fully analyze whether the Teaming Agreement was enforceable.  Trianco, LLC v. Int'l Bus. Mach. Corp., 271 Fed. Appx. 198, 202 (3d. Cir. 2008) ("Trianco CC").  In particular, the Third Circuit asked that I consider whether Trianco received consideration if, as I held, the Teaming Agreement was only binding on the parties to negotiate in good faith.  Additionally, the Third Circuit remanded the case for a determination of whether Trianco can maintain a claim for unjust enrichment.  Id. at 203.

IBM has reasserted its Motion to Dismiss.  According to Fed. R. Civ. P. Rule 12(b)(6), a court must grant a motion to dismiss if the plaintiff fails "to state a claim upon which relief can be granted."  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (internal quotations omitted).

II.  DISCUSSION

IBM now renews its Motion to Dismiss contending that the Teaming Agreement was an enforceable preliminary agreement that precludes Trianco's unjust enrichment claim.  Trianco responds that the *entire* Teaming Agreement is unenforceable (so as not to preclude an unjust enrichment claim).   In the alternative, Trianco argues that the binding portion (namely the duty to negotiate in good faith) does not cover the scope of the unjust enrichment claim.  Trianco claims

---

[2] One may speculate as to why Trianco decided not to pursue a claim against IBM for the failure to negotiate in good faith: a claim that IBM conceded Trianco could bring under the terms of the Teaming Agreement.

that it is entitled to restitution from IBM to compensate for the benefits that Trianco provided to IBM during the bid preparation period.

Trianco agreed, in writing, to provide extensive pre-bid services to IBM in exchange for valid consideration: good faith negotiations as to a subcontract and a right of first refusal.  As discussed in detail below, this type of preliminary agreement is binding and enforceable under New York law,[3] even when it does not bind parties to reach their ultimate objective.   I will first discuss the rationale of the New York courts in reaching this conclusion.  I will then explain why the Teaming Agreement is a binding preliminary agreement to negotiate in good faith.  Lastly, I will address how this precludes Trianco's unjust enrichment claim.

A. Rationale

As will be developed in this memorandum, New York case law recognizes binding preliminary agreements.  Allowing parties to form binding preliminary agreements balances numerous policy concerns.  This enables parties to begin collaborative projects with assurances of cooperation, but without spending time, money, and energy ironing out every detail of a future contract.  Under the terms of a binding preliminary agreement, such as the Teaming Agreement, parties are only bound to negotiate in good faith.  This ensures that parties are not bound to a surprise contract with indefinite or undecided terms.

Recognizing unjust enrichment claims for actions promised in a Teaming Agreement would severely undermine the existence of such agreements.  New York law anticipates that in preliminary agreements such as the Teaming Agreement, parties will determine the preparatory actions that each party will take to work together towards an ultimate objective, with the

---

[3]  As per the parties' written agreement, New York law governs the claims.

understanding that good faith negotiations regarding that objective will occur in the future. Courts further recognize that these negotiations *do not* bind parties to reach a final agreement and that negotiations may fail, thereby terminating the agreement. Under that framework, it would be illogical to allow a party to collect under an unjust enrichment cause of action for the preparatory actions outlined in the preliminary agreement leading up to the negotiations.

To use the Seventh Circuit's words, "[u]njust enrichment does not apply 'where preliminary services are conferred for business reasons, without the anticipation that reimbursement will directly result, but rather, with the expectation of obtaining a hoped-for contract and incidental to continuing negotiations related thereto." Johnson v. Gudmundsson, 35 F.3d 1004, 1114 (7th Cir. 1994) (quoting Rutledge v. Housing Authority of East St. Louis, 411 N.E.2d 82, 86 (Ill. App. 1980)). Trianco agreed to help IBM secure a government bid in exchange for good faith subcontract negotiations and the right of first refusal. If one acknowledges the role of a preliminary agreement such as is recognized under New York law, one cannot allow a party to recover under unjust enrichment for the performance promised in order to secure the "hoped-for" contract and future negotiations. Id. Trianco made a business decision to enter into the Teaming Agreement and help IBM secure the government contract without the expectation of being directly compensated for this help. Instead, Trianco believed that in exchange for their work they would be able to negotiate a satisfactory subcontract with IBM. Unfortunately this did not occur, perhaps because IBM did not negotiate in good faith, or perhaps because Trianco was unwilling to negotiate in the context of a much lower bid by a competitor. To compensate Trianco for the expenditures promised to obtain a return promise of future negotiations would undermine the legal concept of binding preliminary agreements. The Teaming Agreement reflects IBM's expectation

7

that after receiving the government contract they would be able to look for a subcontractor in the open market, while also negotiating in good faith with Trianco and giving Trianco the right of first refusal to match any bidder.  Furthermore, if IBM did not negotiate in good faith as promised, New York law gives Trianco recourse through a cause of action for breach - quasi-contract relief is not necessary.  If Trianco had brought a claim for breach of IBM's duty to negotiate in good faith, a factual inquiry would have determined whether or not Trianco was entitled to recover under the Teaming Agreement.

Even if Trianco were taken advantage of in this situation, it is not the court's job to reallocate losses stemming from poor business decisions.  Trianco could have brought a contract claim for breach of IBM's duty to negotiate in good faith, or, perhaps preferably, protected itself originally through the language in the Teaming Agreement.  As the Second Circuit said, "'a party that does not wish to be bound. . . can very easily protect itself by not accepting language that indicates a "firm commitment" or "binding agreement."'  Conversely, a party that *wishes* to be bound can very easily protect itself by refusing to accept language that shows an intent *not* to be bound."  Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989) (emphasis in original) (quoting Teacher Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp 491, 499 (S.D.N.Y. 1987)).  In light of New York's recognition of binding preliminary agreements, parties must carefully word such agreements to ensure that they do not promise too much, knowing that neither party is bound to the ultimate objective.  It is important to balance promising too little (perhaps losing the right to good faith negotiations, or the right of first refusal as in this case) and promising too much (incurring losses if the negotiations fail).  Finding this balance, as it is with forming any binding agreement, is the responsibility of the parties, not the courts.  Parties must

8

decide what to promise in binding preliminary agreements, with the understanding that each party is only obligated to negotiate towards an ultimate objective, and that this objective may never be realized.

B. Enforceable Preliminary Agreements

Fortunately there are a number of recent opinions from the Second Circuit Court of Appeals to give guidance on preliminary agreements under New York law, including one decided a few weeks ago.  Vacold LLC, v. Cerami et al, 2008 WL 4426485 (2d Cir. Oct. 2, 2008); Network Enters., Inc. v. APBA Offshore Prods., Inc., 264 Fed. Appx. 36 (2d Cir. 2008) (non-precedential); Brown v. Cara, 420 F.3d 148 (2d Cir. 2005).  All of these rely heavily on the 1987 opinion of Judge Pierre Leval (currently a judge on the Second Circuit Court of Appeals but formerly a District Judge in the Southern District of New York) that set forth two types[4] of preliminary agreements under New York law.  Teacher Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp 491, 498 (S.D.N.Y. 1987).  Judge Leval's definitions have also been adopted by New York State Courts.  The Second Circuit found that "New York Courts have cited with approval Tribune and Adjustire [Adjustire Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543 (2d Cir. 1998)] and appear to recognize the possibility of Type II agreements."  Cara, 420 F.3d at 153 (citing SNC, Ltd. v. Kamine Eng. and Mech. Contracting Co., Inc., 238 A.D.2d. 146 (App. Div. 1997); River Glen Assoc., Ltd. v. Merrill Lynch Credit Corp., 295 A.D.2d 274 (App. Div. 2002)); see also Snakepit Automotive, Inc. v. Superformance Intern, LLC, 2008 WL 899024, at *4 (N.Y.Sup. March 31, 2008) (recognizing the two types of 'preliminary agreements' as defined by Tribune).

---

[4]  Judge Pierre Leval titled two types of binding preliminary agreements as Type I and Type II.  These titles have subsequently been used by the Second Circuit and other New York courts and will be used in this opinion.  Teacher Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp 491, 498 (S.D.N.Y. 1987).

9

In the first type of preliminary agreement (Type I) the parties have "agreed to all necessary elements of the contract and are, therefore, bound to the ultimate objective despite the fact that a more formal or elaborate writing has yet to be produced."  <u>Cara</u>, 420 F.3d at 154; <u>see also Vacold</u>, 2008 WL 4426485 at *9 (finding that Type I preliminary agreements are "fully binding" and "created when the parties agree on all the points that require negotiations (including intent to be bound) but agree to memorialize their agreement in a more formal document").  Here, a finding that the Teaming Agreement was a Type I agreement would have bound IBM to give the subcontract to Trianco.  The Third Circuit has already spoken - the Teaming Agreement was not a Type I binding agreement.

The second type of enforceable preliminary agreement (Type II) does not bind parties to the ultimate objective (here, the subcontract) but *does* bind parties to make a good faith effort to negotiate toward the ultimate objective.  <u>Tribune</u>, 670 F. Supp at 498.  Type II agreements are "'binding only to a certain degree'" because "'the parties agree on certain major terms, but leave other terms open for future negotiation.'" <u>Vacold</u>, 2008 WL 4426485 at *9 (quoting <u>Adjustire</u>, 145 F.3d at 548).  Parties are not bound to their "'ultimate contractual objective'" but are bound to "'negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework.'"  <u>Id</u>.  New York law recognizes binding preliminary agreements because courts want to "avoid trapping parties in surprise contractual obligations that they never intended," while protecting parties by enforcing "agreements that were intended as binding, despite a need for further documentation or further negotiation."  <u>Tribune</u>, 670 F. Supp at 497-8.  Recognizing binding preliminary agreements acknowledges parties' intentions and expectations while simultaneously realizing the need for future negotiations.  <u>Id.</u>  Additionally, recognizing binding preliminary

agreements allows parties to proceed in negotiations with the security of having reached an agreement, before spending large amounts of time and money ironing out all of the specific details.

1. The Teaming Agreement is a Binding Type II Preliminary Agreement

In Tribune, Judge Leval laid out a five factor test to determine whether or not a preliminary agreement is a binding Type II agreement, "1) whether the intent to be bound is revealed by the language in the agreement; 2) the context of the negotiations; 3) the existence of open terms; 4) partial performance; and 5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." Tribune, 670 F. Supp at 499-503; Vacold, 2008 WL 4426485 at *9; Network, 264 Fed. Appx. at 36;  Cara, 420 F.3d at 157; Arcadian, 884 F.2d at 72. Judge Leval also stated that parties cannot demand performance of the ultimate objective in a Type II preliminary agreement, but they can demand good faith negotiation toward a final contract. Tribune, 670 F.Supp at 498.  A Type II preliminary agreement does not guarantee that a final agreement will be reached, as good faith differences during negotiations may preclude this.  Id.

Tribune involved a lender's allegation that a borrower breached a "commitment letter agreement."  670 F.Supp at 491.  The commitment letters termed the agreement "binding . . . subject to the preparation and execution of final documents satisfactory to both sides and the approval of the borrower's Board of Directors."  Id.  The letters also stated that the agreement was contingent on the "'preparation, execution and delivery'" of certain documents that would contain the "'usual and customary' representations and . . . conditions." Based on the language in the letters as well as the circumstances surrounding the communications, Judge Leval held that the letters constituted a binding preliminary agreement that obligated both parties to negotiate a final loan agreement in good faith and that the borrower breached this agreement.

The <u>Cara</u> court found that the parties' two-page "Memorandum of Understanding ('MOU')" was a Type II preliminary agreement that bound the parties to negotiate in good faith in order to pursue a property development project.  420 F.3d at 159.  In the MOU the parties agreed to "'work together to develop, build, market and manage a new real estate venture.'"  <u>Id</u>. at 150 The MOU stated each party's responsibilities and their intent to "'enter into a formal contract shortly."  <u>Id.</u> at 151.  The plaintiff took substantial steps to prepare for this project, but after a mis-communication, the defendant refused to negotiate.  The court held that the MOU did not bind the parties to complete the development project, but it did bind the defendant to negotiate with the plaintiff in good faith.  <u>Id.</u> at 153.  The Second Circuit then remanded to the District Court to determine if the facts reflected good faith negotiations.  <u>Id.</u> at 157.

Trianco relies heavily on <u>Arcadian</u> in arguing that the Teaming Agreement was not an enforceable Type II agreement; however, Trianco misinterprets the <u>Arcadian</u> decision.  In 1989, (pre-<u>Cara</u> and pre-<u>Vacold</u>) the <u>Arcadian</u> court recognized the existence of two types of preliminary agreements under New York law, as defined by Judge Leval in <u>Tribune.</u>   884 F.2d at 72.  In <u>Arcadian,</u> the Second Circuit applied the <u>Tribune</u> five factor test to determine if a one-and-a-half page memorandum (termed an "agreement") was a binding *contract for the sale* of the plaintiff's fertilizer business.[5]  <u>Id.</u> at 70.  The court recognized that Type II agreements leave some terms open for future negotiations, as did the agreement at issue in <u>Arcadian</u>.  <u>Id.</u>  However, the appellants in <u>Arcadian</u> asked the court to find that the preliminary agreement "was a binding contract for the sale

---

[5]  The <u>Arcadian</u> Court applied the <u>Tribune</u> five-factor test used to determine if a preliminary agreement was "of the second type."  884 F.2d 69, 72 (2d Cir. 1989).  However, the issue in <u>Arcadian</u> was whether the agreement was a binding contract for sale (the ultimate objective) and the court did not discuss whether the parties were bound to negotiate in good faith.

of [appellants'] . . . business." Id. at 70.  The Arcadian court *only decided* whether or not the

defendant was bound to a contract of sale (analogous to the decision in Trianco DC that IBM was

not bound to award a subcontract to Trianco).  Therefore, even though the Arcadian court discussed

Judge Leval's factors (concentrating almost exclusively on the first, intent to be bound) that court's

analysis is not helpful in deciding this case.

i. Intent to be Bound

The first factor, whether the intent to be bound is revealed in the language of the agreement,

is the "most important factor" in determining if a binding Type II agreement exists.  Tribune, 670

F.Supp. at 499.  In finding an intent to be bound, the Tribune court emphasized that the parties used

the words "binding" and "firm commitment" in their agreement.  Id.  An intent to be bound to

negotiate in good faith can also be ascertained when the agreement articulates that the parties will

"work together" to achieve the ultimate goal of the preliminary agreement, while reserving specific

details for future negotiations.  Cara, 420 F.3d at 158; see also Vacold, 2008 WL 4426485 at *10

(differentiating a "'proposal'" or promise to "'work together'" in a Type II agreement from a fully

binding Type I agreement)[6].  In Cara, the court found an intent to be bound when the parties agreed

to "work together to develop [properties] and work together in accordance with the terms and

conditions outlined [in the preliminary agreement]." Id. Moreover, parties indicate an intent to be

bound by creating a preliminary agreement that outlines a "general framework in which the parties

will proceed in good faith toward the goal … while preserving for later negotiation the specific

---

[6]  The dissent in Vacold also points out that if a court finds intent to be bound it is
important to determine what kind of agreement the parties entered into, because both types of
preliminary agreements are binding.  2008 WL 4426485 at *18 (2d Cir. October 2, 2008).  The
dissent found that the agreement in Vacold did not require the parties to reach the ultimate
contractual objective, but was a Type II agreement that required them to engage in good faith
negotiations towards that end.  Id. at *19.

details of necessary business design, construction, financing, and management terms." <u>Id.</u>   In

<u>Network,</u> the Second Circuit found intent to be bound in a Type II agreement when the parties

provided that the open terms in a renewal option "shall be mutually agreed to by the parties."  264

Fed. Appx. at 38.  The court interpreted this language as suggesting that the parties were bound to

work out the details under the agreement.  <u>Id.</u> The language of the Teaming Agreement is similar to

the language discussed in <u>Tribune</u>, <u>Cara,</u> and <u>Network</u>.

   Like the parties in <u>Cara</u>, IBM and Trianco "recognize[d] the efficiency of teaming"

(Teaming Agreement, p. 1) and agreed to work together to create a bid proposal; if IBM secured this

contract, both parties agreed to be bound to negotiate a subcontract in good faith.  The Teaming

Agreement states, "[a]fter the successful award of a contract to IBM, the parties will in good faith

negotiate mutually acceptable terms and conditions of the subcontract." (Teaming Agreement §1.4).

This language is even stronger evidence of intent to be bound than the language in <u>Network</u> that

open terms "shall be mutually agreed to by the parties."  264 Fed. Appx. at 38.  Furthermore, the

Teaming Agreement specifically stated that "[n]othing in this Agreement shall be construed to give

one party the authority to *bind* the other party *except as expressly provided for herein*." (Teaming

Agreement §13.2) (emphasis added).  Under this language both parties expected to be bound by

what was expressly provided for in the Teaming Agreement, which included that Trianco would

assist IBM in preparing the bid and that if IBM were awarded the contract with the government,

both parties would negotiate in good faith to come to mutually agreeable terms for the subcontract.

The Teaming Agreement also stated that the agreement was formed "in express reliance upon the

mutual promises and covenants contained herein." (Teaming Agreement, p. 1).  These promises

included Trianco's responsibilities in preparing the prime bid proposal. (Teaming Agreement § 1.2).

Trianco contends that the language in the Teaming Agreement indicates that the parties did not intend to be bound, and therefore the agreement was not a binding Type II preliminary agreement.  In supporting this claim, Trianco points to language indicating the possibility of the Teaming Agreement failing, and compares this language to that of the agreement in Arcadian. Section 5.1(f) of the Teaming Agreement states that the agreement will "remain in effect until . . . the parties fail to negotiate and execute a subcontract containing mutually satisfactory prices and terms" within a reasonable time (this was one of the ways the agreement could terminate).  Also, the last sentence of the "Scope of Work" addendum states that "Trianco's support/participation is subject to the ability of the parties to negotiate mutually acceptable terms and conditions, and Trianco offering competitive pricing."

The premise behind a Type II agreement is that the parties are bound to negotiate in good faith but are not bound to achieve the ultimate objective.  Cara, 420 F.3d at 158.  Referencing the possibility that the ultimate objective may not occur does not render a preliminary agreement unenforceable.  Tribune, 670 F.Supp at 500.  The language of the Teaming Agreement indicates that the agreement terminates if the negotiations fail (i.e. the ultimate objective is not reached), but *is binding until* good faith negotiations occur (the agreement "*will remain in effect* until . . . the parties fail to negotiate and execute a subcontract") (Teaming Agreement §5.1(f)) .  This language denotes that IBM was not bound to give the subcontract to Trianco but that both IBM and Trianco were bound to negotiate in good faith before the agreement could terminate.  Furthermore, language indicating that the agreement will terminate if negotiations fail acknowledges that there was an agreement up until the point of termination.  Both IBM and Trianco were bound by all of the

15

defined terms in the agreement until they participated in good faith negotiations that failed, at which point the agreement would terminate and neither party would be bound.

The Teaming Agreement includes conditions that must be met before the parties would be bound to negotiate, such as the award of the government contract to IBM and approval of Trianco as an acceptable contractor by the government.  Trianco argues that these conditions infer an intent not to be bound.  The <u>Tribune</u> court points out, however, that language referencing conditions and reservations "d[oes] not override and nullify" other language implying an intent to be bound to the terms in the preliminary agreement; conditions simply indicate that there are some issues that remain to be negotiated in the future.  670 F. Supp at 500.  An agreement that establishes conditions "tend[s] to indicate an intention not to bound," but does not require this conclusion, especially when the court is determining only whether the parties had entered into a binding preliminary agreement.  <u>Tribune</u>, 670 F. Supp at 500 (citing <u>Reprosystem v. SCM Corp.</u>, 727 F.2d 257, 262 (2d Cir. 1984) and <u>R.G. Group v. Horn & Hardart Co.</u>, 751 F.2d 69, 75 (2d. Cir 1984)).

The language in the Teaming Agreement manifests both parties' intent to be bound by the terms in the agreement and, if IBM was awarded the contract, to negotiate a subcontract in good faith.  Finding that both parties intended to be bound weighs heavily in finding the Teaming Agreement to be a binding preliminary (Type II) agreement.

<u>ii. Context of Negotiations</u>

Second, courts must look at the context of the negotiations during which the preliminary agreement was reached.   "An agreement is likely to be a type II preliminary agreement . . . when it is 'subject to numerous contingencies that ha[ve] the potential to dramatically affect planning, execution, and management' of the ultimate contractual objective."  <u>Vacold,</u> 2008 WL 442685 at

*12 (quoting Cara, 420 F.3d at 158).  In Cara, the Second Circuit determined that the context of the negotiations favored the finding of a Type II agreement because the parties were discussing a future development project that was subject to many contingencies.  Cara, 420 F.3d at 158.  The parties wanted to "negotiate a general framework within which they could proceed while preserving flexibility in the face of future uncertainty."  Id.  This is precisely the uncertain climate in which IBM and Trianco were negotiating the Teaming Agreement.  Neither IBM nor Trianco knew if IBM would receive the government contract, but each party wanted to work out an agreement that would increase the chances of IBM getting the contract, and if that occurred, bind both parties to negotiate a subcontract in good faith.  At the time when IBM and Trianco were negotiating the Teaming Agreement it may not have made sense to work out all the details of a potential future subcontract; in the event that IBM did not receive the primary contract, this could have resulted in substantial time and energy wasted.

The Teaming Agreement was designed, in part, to obligate Trianco to work exclusively with IBM to provide the "technical expertise" necessary to create a successful bid proposal. Furthermore, the Teaming Agreement and the negotiations contemplated that if IBM won the contract, then the two parties would further negotiate regarding the details of the subcontract. Therefore, the potential award of the subcontract to Trianco was conditioned on IBM winning the government contract.  The contingency of the relationship, including factors that could not be determined at the time of the initial negotiations, as in Cara, reinforces IBM's argument that this is a binding Type II agreement requiring further negotiations.  Therefore, the context of the negotiations that led to the Teaming Agreement confirms that an enforceable Type II agreement exists.

iii. Existence of Open Terms

17

The third factor to be considered is the number of open terms in the agreement.  Although the existence of open terms in an agreement may suggest intent not to be bound, when the "question is whether a preliminary expression of commitment was intended to bind the parties to negotiate the open terms in good faith, the mere fact of the existence of open terms is, of course, far less persuasive."  Tribune, 670 F. Supp at 502.  When the parties have shown an intent to be bound, the "mere fact of open terms will not permit them to disavow it."[7]  Id.  Type II agreements "by definition, comprehend the necessity of future negotiations and contracts" as the parties work together in a "defined framework."  Cara, 420 F.3d at 157-59.

In Cara, the court found that the preliminary agreement was an enforceable Type II agreement although the agreement left open almost all terms "critical" to the project "from design, to business structure, to ownership and management."  420 F.3d at 158.   Furthermore, the Southern District of New York found that a preliminary agreement in the form of a Renewal Option was enforceable even though remaining "material" terms were left open.  Network Enters., Inc. v. APBA Offshore Prods., 427 F. Supp 2d 463, 485 (S.D.N.Y. 2006), aff'd, 264 Fed. Appx. 36 (2d Cir 2008).   The court also noted that the open terms were "readily amenable to agreement through negotiations conducted in mutual good faith."  Id.   In affirming the District Court's decision in Network, the Second Circuit pointed out that though open terms in a preliminary agreement create a presumption against finding a binding contract as to the ultimate objective (a Type I agreement),

---

[7]  Trianco's interpretation of Shann v. Dunk that only "boilerplate" terms can be missing from a binding preliminary agreement is without merit.  84 F.3d 73, 78 (2d Cir. 1996).  In Shann, the court found that the contract in question could have been viewed as a Type II agreement because some "boilerplate" remained to be negotiated.  The court went on to say that such an incomplete agreement could bind both parties to negotiate in good faith to reach a "final agreement within the scope of the terms that have already been agreed."  Id. at 82.  This does not indicate that only "boilerplate" omissions can create a binding preliminary agreement.  Id.

"these same omissions may actually support finding a binding Type II agreement." 264 Fed. Appx. at 38 (quoting Cara, 420 F.3d at 158).

Trianco argues that the Teaming Agreement had too many open terms to constitute a binding preliminary agreement. In particular, Trianco takes the position that because many of the terms for a potential subcontract were left open in the Teaming Agreement, neither party can be bound to anything. Trianco analogizes their case to Arcadian where the court found a preliminary agreement to be unenforceable as to a contract of sale, in part because the agreement contained open terms. 884 F.2d at 69. In addition to the irrelevance of Arcadian explained previously, the Arcadian court based its decision primarily on the language of the agreement, which did not imply an intent to be bound, not on the existence of open terms. Id. at 73. In fact, in their analysis of the Tribune test, the Arcadian court stated, "we need look no further than the first factor." Id. at 72. The Arcadian court contrasted the agreement in its case to the agreement in Tribune, saying, "[i]n Tribune, the language of the agreement argued persuasively for overcoming the presumption [against finding binding obligation in agreements with open terms]; here, the language of the agreement argues persuasively for letting the presumption stand." Id. at 73. As discussed above, the language in the Teaming Agreement revealed an intent to be bound. Therefore, this case is similar to Tribune, Cara, and Network, where despite numerous open terms, the court found that the agreement manifested an intent to be bound.

IBM also points out that the Teaming Agreement actually included more material terms than the enforceable Type II agreements found in previous cases.[8] In fact, the Teaming Agreement

_____

[8] Trianco argues that this case is similar to Imtrac Indus, Inc. v. Glassexport Co., Ltd., 1996 WL 39294, at *9 (S.D.N.Y. Feb. 1, 1996). However, the Imtrac court determined that the agreement failed to set forth "any agreed major terms." Id. The Teaming Agreement is not void of all major terms.

included a "Scope of Work" document that listed Trianco and IBM's duties under the agreement. The Teaming Agreement also provided for a price ceiling for the potential subcontract and specified numerous other terms, such as the individual responsibilities of the parties, limitations on liability, severability, and the requirement of further negotiations in good faith.  (Teaming Agreement §§ 1.0, 1.4, 8.0, 9.0, and 12.0).  Therefore, the existence of open terms regarding the details of the potential subcontract does not preclude finding the Teaming Agreement to be a binding preliminary agreement.

iv. Partial Performance

The fourth factor is partial performance.  Partial performance becomes relevant when "one party has partially performed, and that performance has been accepted by the party disclaiming the contract."  R.G. Group v. Horn and Hardart Co., 751 F.2d 69, 75 (2d Cir. 1984).  Partial performance is an "unmistakable signal" that both the performing party and the party accepting performance believe a binding contract to be in effect.  Id. at 75-6.  Partial performance exists only when one party "confer[s] something of value" and the other party accepts.  Rappaport v. Buske, 2000 WL 1224828, at *7 (S.D.N.Y. August 29, 2000) (citing R.G. Group, 751 F.2d at 75).  The Cara court relied on partial performance, in part, to find a binding Type II agreement: because the plaintiffs "provided extensive and valuable performance within the framework described by the [agreement]. . . . [p]laintiffs are entitled to demand defendants' good faith in negotiating remaining open terms." 420 F.3d at 158.   Trianco provided extensive and valuable performance within the framework of the Teaming Agreement, therefore Trianco was entitled to demand IBM's good faith in negotiating the terms of a subcontract.  Trianco does not contend, however, that they are asserting a cause of action arising from IBM's duty to negotiate in good faith.  Interestingly, here it is Trianco

that partially performed under the Teaming Agreement and yet Trianco is the party contending that this preliminary agreement is <u>not</u> binding in order to pursue an unjust enrichment claim.[8]

Trianco substantially performed its duties outlined in the Teaming Agreement.  The Amended Complaint explains that Trianco "prepare[d] technical proposals" including site surveying, site preparation, installation, and removal, and  drafted "detailed pricing proposals." (Amend. Complaint ¶¶ 22-25).  Trianco's actions would clearly be considered partial performance; Trianco provided "something of value" under the terms of the agreement, which IBM accepted. <u>R.G. Group</u>, 751 F.2d at 75.   This performance is analogous to that of the plaintiff in <u>Cara</u> who "expended significant time and energy to design [the development project] and to clear a number of political and regulatory hurdles."  420 F.3d at 155.   The <u>Cara</u> court found that this partial performance "cut[] strongly in favor of" holding that the preliminary agreement (Type II)  *did* bind the parties to negotiate in good faith, even though (as in Trianco and IBM's case) the agreement *did not* bind the parties to complete the development project.  <u>Id.</u> at 158, 153.  Trianco's partial performance under the Teaming Agreement adds support to binding the parties to its terms.

<u>v. Customary Form of Transaction</u>

The fifth and final factor for a court to consider in deciding if a preliminary agreement is binding, is to look at the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.  Teaming Agreements, as "normally understood withing the

---

[8]  However, a party's partial performance can be used to show intent to be bound to an agreement even when that same party later claims that the agreement is not binding.  <u>See Inc., v. Power House Maintenance, Inc.</u>, 2004 WL 1433203, at *2 (N.Y. Sup. March 8, 2004) (finding that defendant's performance could have bound defendant to the contract had the performance been significant enough to constitute partial performance); <u>Ogden Martin Sys. of Tulsa, Inc., v. Tri-Continental Leading Corp.</u>, 734 F. Supp. 1057, 1070 (S.D.N.Y. 1990) (applying the <u>Tribune</u> factors to discuss that the defendant's partial performance could have supported an intent to be bound if the performance was more substantial).

context of government contracting" are agreements "whereby a subcontractor will 'team' with a company intending to bid on a government contract as a prime contractor in order to pool financial and technical resources."  ATACS Corp. v. Trans World Comm., Inc., 155 F.3d 659, 666 (3d Cir. 1998).  The subcontractor then expects to work out a subcontract with the contractor once the primary bid is accepted by the government.  Parties will frequently reach Teaming Agreements, but fail to satisfactorily negotiate a subcontract. Id.

The Cara court determined that it was customary, "by definition," for a Type II preliminary agreement to require future negotiations toward more formal and extensive contracts.  420 F.3d at 158.  As discussed above, the binding Type II agreement in Cara was similar to the Teaming Agreement between Trianco and IBM, as the relationship between the parties in both cases was contingent on an extraneous event, and the language in both agreements indicated an intent to be bound.  Teaming Agreements will generally contemplate a second, future agreement (a subcontract) that is contingent on the prime contractor receiving the government bid.  A written agreement binding the parties to negotiate details of a subcontract in good faith once a primary bid is accepted is in keeping with the customary nature of teaming agreements.

After reviewing these five considerations, I conclude that the Teaming Agreement was an enforceable Type II preliminary agreement that bound the parties.

2. Trianco Received Consideration Under The Teaming Agreement.

If the Teaming Agreement did not bind IBM to award Trianco a subcontract, the Third Circuit questioned whether Trianco received consideration for the time, energy, and finances expended helping IBM create a bid proposal.  Absent a claim of fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny.  Spaulding v. Benenati, 57

N.Y.2d 418, 423 (N.Y. 1982) (citing <u>Mencher v. Weiss</u>, 306 N.Y. 1, 8 (1953) ( "the slightest

consideration is sufficient to support the most onerous obligation; the inadequacy...[is] not for the

court" to consider)).  Parties can enter into any contract they choose, "so long as there is no fraud or

deception or infringement of law [and] the fact that the bargain is a hard one will not deprive it of

its validity."  <u>Mandel v. Liebman</u>, 303 N.Y. 88, 93 (1951).  IBM and Trianco both received valid

consideration under the Teaming Agreement.  Trianco promised to help IBM prepare a bid and

negotiate a subcontract in good faith, and IBM, in return, also promised to negotiate a subcontract in

good faith and to give Trianco the right of first refusal if IBM received the government contract.

<u>i. Promise of Good Faith Negotiations</u>

      Under New York law, good faith negotiations can be valid consideration in a Type II

agreement.  The <u>Cara</u> court held a Type II agreement enforceable based on promises to negotiate in

good faith.  This held true although the plaintiff expended significantly more time and energy on the

project than did the defendant.  <u>Cara</u>, 420 F.3d at 155.  In <u>Cara</u>, the plaintiffs "provided extensive

and valuable performance within the framework described" in the agreement and therefore were

"entitled to demand defendants' good faith in negotiating remaining open terms."[9]  <u>Id.</u> at 158.  As

explained in <u>Spaulding</u> and <u>Mencher</u>, it is not the court's job to invalidate consideration even if it

leads to an unbalanced agreement.  57 N.Y.2d at 423; 306 N.Y.1 at 8.  "There is doubt whether a

privilege so uncertain would be worth a great deal, [yet] we do not believe that the court should

interfere in the voluntary agreement reached by sophisticated parties to a contract."  <u>Spaulding</u>, 57

N.Y.2d at 423.

---

[9] <u>See infra</u>, at Part B.3, Trianco would be able to demand good faith negotiations from
IBM in return for their extensive performance under the Teaming Agreement, yet Trianco does
not make this claim.

Trianco provided IBM with valuable knowledge and technical expertise in preparation for the bid proposal, and IBM promised that, "[a]fter the successful award of a contract to IBM, the parties will in good faith negotiate mutually acceptable terms and conditions of the subcontract." (Teaming Agreement § 1.4).  IBM also promised to work with the government agency to ensure that Trianco would be accepted as a suitable subcontractor.  The Teaming Agreement may have been unbalanced, as the subcontract was uncertain, resulting in significant financial loss to Trianco at IBM's gain.  Perhaps from a business standpoint the promise of good faith negotiations and the right of first refusal (discussed below) were insufficient to balance the work that Trianco put into the bid preparation.  However, this imbalance does not indicate a lack of valid consideration, nor does it invalidate the agreement.

ii.  The Right of First Refusal

As further consideration for Trianco's help in forming the bid proposal, IBM paired its promise of good faith negotiations with a right of first refusal as to the subcontract.  A right of first refusal typically arises in a sales context once an owner has received an offer from a third party and intends to accept this offer.  3 CORBIN ON CONTRACTS § 11.3, at 470 (rev. ed. 1996). Then, the right of first refusal is triggered and the holder of the right must decide whether or not to enter into a contract with the owner under the same terms that the third party has offered.  Id.  New York courts have held that a right of first refusal is valid consideration and can only be upheld if valid consideration is provided in return.  Space Imaging Europe, LTD. and Tower Group, Inc., v. Space Imaging L.P., et al., 38 F.Supp.2d 326, 333 (S.D.N.Y. 1999) ("'right[s] of first refusal must be supported by valid consideration or its equivalent") (quoting 3 CORBIN ON CONTRACTS § 11.3, at 468-69 (rev. ed. 1996))); see Sel-Leb Marketing, Inc. v. Dial Corp. and Fasma, LLC, 2002 WL

24

1974056, at *5 (S.D.N.Y. August 27, 2002) (holding that buyer could not enforce right of first refusal against seller because buyer had not provided consideration in exchange for this right).

As further consideration for Trianco's work, in addition to the promise of good faith negotiations, the Teaming Agreement gave Trianco the right of first refusal to perform the work if the contract was awarded to IBM, provided that Trianco offered competitive pricing and an acceptable plan:

> IBM intends for Trianco to perform all or most of the work in the areas listed below [site surveys and site preparation]. If Trianco offers competitive pricing, availability of competent resources, and an acceptable plan/strategy to perform the work in these areas, Trianco will have the right of first refusal to performs this work.
> (Scope of Work, p. 2).

In consideration for the work Trianco did at the preliminary stages to help IBM secure the bid, Trianco was essentially guaranteed the subcontract if they could match the lowest bidder. The extensive time and energy Trianco spent helping IBM get the government contract was supported by consideration even though there was a possibility that Trianco and IBM would not be able to negotiate a subcontract. The Teaming Agreement was supported by valid consideration because both parties were bound to negotiate a subcontract in good faith once the primary contract was awarded to IBM, and Trianco had the right of first refusal as to the subcontract.

3.  Binding Duty to Negotiate in Good Faith Under a Type II Agreement

Both IBM and Trianco were bound to the defined terms of the Teaming Agreement, including a duty to negotiate in good faith. New York law recognizes a cause of action under Type II preliminary agreements for breach of the duty to negotiate in good faith. See Endovasc. Ltd. v. J.P. Turner & Co., LLC, 169 Fed. Appx. 655, 657 (2d Cir. 2006) (holding that plaintiff did not

assert a valid claim under a preliminary agreement because plaintiff asserted breach of a contract to provide $15 million, instead of breach of contract to "*negotiate* a $15 million financing arrangement in *good faith*.") (emphasis in original); <u>Cara</u>, 420 F.3d at 157 (concluding that the agreement at issue was a binding Type II agreement and remanding to the District Court to determine if the facts in the case "reflect good faith"); <u>Network</u>, 427 F.Supp.2d at 487 (awarding the plaintiff $400,000 in damages for a breach of the duty to negotiate in good faith)[10].   In <u>Endovasc</u>, the Second Circuit held that the plaintiff did not state a valid claim under a preliminary agreement by alleging breach of a contract for the ultimate objective (a financing arrangement). 169 Fed. Appx. at 657.  Notably, that court held that the plaintiff *could* have asserted a valid claim for breach of the duty to negotiate in good faith, just as Trianco could have done here.  <u>Id.</u>

IBM conceded that if they did not perform their duty to negotiate under the agreement Trianco could have brought a claim for breach of the duty to negotiate in good faith.  Trianco reiterated during the recent oral argument that it is not suing IBM for a breach of its duty to negotiate in good faith.

## C. Unjust Enrichment

---

[10]   The <u>Network</u> court acknowledged that, in some cases, the amount of damages arising from a refusal to negotiate may be difficult to calculate.  426 F.Supp.2d at 487.  These damages are not equivalent to the damages that a party incurs by not reaching the ultimate objective of the preliminary agreement, as that objective is not binding.  "Since the obligation to negotiate a contract in good faith does not guarantee that a final contract would be concluded if both parties complied with that obligation, the calculation of damages caused by a breach may in some circumstances be problematical."  <u>Id.</u>  The fact that damages are available, though perhaps hard to calculate, indicates that a claim for breach of the duty to negotiate in good faith exists.

The existence of an enforceable agreement precludes a quasi contract[11] claim for events arising out of the same subject matter.  Clark-Fitzpatrick, Inc. v. Long Island R. Co., 516 N.E.2d 190, 192 (N.Y. 1987).  A quasi contract claim for unjust enrichment is only considered when there is no express agreement "*by word or act, on the part of either party involved*."  Id. at 193 (emphasis in original).  "It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties."  Id. Furthermore, unjust enrichment is only an available remedy when no remedy is available by action on a contract.  5 S. Williston, Contracts (Rev. Ed. )§ 1479; see also Trianco CC, 271 Fed. Appx. 198, 202 ("[u]njust enrichment is a 'quasi-contract claim' and 'is an obligation the law creates in the absence of any agreement'"(quoting Goldman v. Metro. Life Ins. Co., 841 N.E.2d 742, 807 (N.Y. 2005))).   The existence of an enforceable written Type II agreement and a legally recognized claim for breach of this agreement precludes Trianco's unjust enrichment claim over the subject matter of that agreement.  Neither IBM nor Trianco contest that Trianco could have pursued a breach of contract claim against IBM for breach of their duty to negotiate in good faith under the Teaming Agreement.  This valid, binding preliminary agreement covers the scope of Trianco's unjust enrichment claim, and therefore precludes such a claim.

Unjust enrichment can be a method of recovery despite a valid contract if the court finds that the contractual obligations "did not encompass the events underlying" the unjust enrichment claim (i.e. when the express agreement does not "'govern the dispute'" between the parties).

---

[11]  A quasi-contract is a legal obligation imposed on parties to prevent unjust enrichment when no express agreement exists.  Clark-Fitzpatrick, Inc. v. Long Island R. Co., 516 N.E.2d 190, 192 (N.Y. 1987).

NET2GLOBE Intl., Inc. v. Time Warner, 273 F.Supp.2d 436, 466 (S.D.N.Y. 2003) (quoting

Bridgeway Corp. v. Citibank, N.A., 132 F.Supp.2d 297, 305 (S.D.N.Y.2001)).   Here, there is a

valid written agreement (the Teaming Agreement) between Trianco and IBM, the terms of which

are enforceable, including that the parties were bound to negotiate in good faith.   Trianco claims

that the Teaming Agreement does not cover the scope of Trianco's unjust enrichment claim.   The

actions Trianco requests compensation for were listed in the Teaming Agreement as

"responsibilities" in Section 1.2.   I find that the Teaming Agreement "encompas[ses] the events

underlying" Trianco's unjust enrichment claim.   Id.

   Trianco argues that the scope of the binding duty to negotiate does not cover the scope of

their unjust enrichment claim, namely compensation for the work product and credentials provided

by Trianco and used by IBM in securing the government contract.   Trianco misinterprets New York

case law in saying that a binding preliminary agreement "binds the parties, reciprocally, to negotiate

in good faith over the 'relatively minor terms' they have left open, *but does not render any of their*

*other commitments or undertakings binding or enforceable at all*." (Plaintiff's Memorandum in

Opposition to Defendant's Renewed Motion to Dismiss at 9) (emphasis added) (quoting Tribune,

670 F. Supp. at 498).   What Judge Leval said in Tribune was that under a Type II binding

preliminary agreement, each party is bound to negotiate in good faith to "conclude a final agreement

*within the terms specified in the commitment letter*." 670 F. Supp at 500 (emphasis added).   Both

parties in Tribune were bound to negotiate in good faith "upon the agreed terms" and neither was

free to walk away or change these terms arbitrarily simply because they determined the agreement

was not in their best interest.   Id. at 499.   A binding agreement had been made "on the stated terms"

even though some reservations, issues, and documentation "remained open which also would

require negotiation and approval." Id. at 500.

Trianco and IBM, similarly, were bound to the terms of the written agreement even though the terms of the potential subcontract were left open.  Neither party could abandon the conditions of the Teaming Agreement or walk away because their interests had changed without a good faith effort of negotiating a subcontract.  Tribune, 670 F. Supp at 499. The terms of the written agreement are unambiguous; the parties' responsibilities, including those that Trianco claims have unjustly enriched IBM, are laid out on the first page of the Teaming Agreement.  In short, Trianco agreed to aid in the preparation of IBM's bid proposal to the government by preparing a cost/price and or technical proposal for what Trianco's responsibilities would be as a subcontractor, provide information and assist IBM in drafting the bid proposal, and participate in negotiations if asked to by IBM.  If Trianco had failed to perform any of these responsibilities, IBM would have had a cause of action for breach of the agreement.  If IBM received the government contract, IBM was obligated to negotiate a subcontract with Trianco in good faith under the terms of the Teaming Agreement and provide Trianco with a right of first refusal.  Furthermore, Section 2.0 says that each party will perform the responsibilities enumerated in the Teaming Agreement at no cost to the other party.  In asserting an unjust enrichment claim, Trianco requests compensation for the consideration given to IBM in exchange for a right of first refusal and good faith negotiations of a future subcontract.  The "events underlying" Trianco's unjust enrichment claim are the acts that Trianco agreed to perform as consideration for the Teaming Agreement; therefore, these acts are "encompass[ed]" by the agreement.  NET2GLOBE, 237 F.Supp.2d at 466.  The Teaming Agreement "governs the dispute" between the parties:  whether IBM upheld its end of the bargain by negotiating in good faith and giving Trianco the right of first refusal. Id. (quoting Bridgeway, 132 F.Supp.2d at 305).

29

Of course, Trianco entered into the Teaming Agreement with the belief that they would eventually receive a subcontract from IBM if IBM was awarded the government contract, and this was not an unreasonable belief.  However, as I found previously, and as the Third Circuit affirmed, under the terms of the Teaming Agreement IBM was not bound to reach an agreement with Trianco regarding a subcontract.  IBM *was bound* to negotiate a subcontract with Trianco in good faith, according to the terms of the agreement, including giving Trianco a right of first refusal.  The finding that the Teaming Agreement was not binding as to the ultimate objective (the subcontract) does not indicate that there is no "valid written agreement" that covers the dispute between Trianco and IBM.  Clark-Fitzpatrick, 516 N.E.2d at 192.   Quite the contrary, the Teaming Agreement fits the definition of a Type II binding preliminary agreement under New York law and provided both parties with a valid cause of action for breach if either one did not abide by the terms of the agreement.

_____For the above reasons, Defendant's Renewed Motion to Dismiss Plaintiff's Unjust Enrichment Claim is **GRANTED**. _____

_____          s/Anita B. Brody

_____
_____          ANITA B. BRODY, J.

_____

_____
_____Copies **VIA ECF** on          to:          Copies **MAILED** on          to:
_____

_____